Well, I'm sorry. I didn't hear how long the break would be. No problem. Do you want to take a minute? No, no. It's the end of the morning. You probably want to go do other things. This is our only job, so it's your turn. Just to review the facts, the shippers' agents shipped seven paintings from Odessa, Ukraine, to Albany, California via UPS. UPS loses the paintings somewhere along the way. UPS claims that they only have to pay $558, which is the insured value, plus refund shipping charges of $189 for a total of $747. Shipper claims UPS's Odessa agents arbitrarily limited the amount of insurance his agent could buy to $558 and that he's entitled to the value of the paintings. The $558 is not a limitation in the waybill or tariff. That comes up on appeal from a grant of summary judgment. Shippers' position on appeal has been that the terms and conditions of the waybill, UPS's shipping contract, are not a mere contract but a tariff, which is a standard rates and conditions UPS offers to the public at large, and it has the force and effect of law. Counsel, even if we interpret the waybill as being a mere contract, as they put it, why is it that that contract has been violated? How has that contract been violated? Okay, the UPS tariff says that the terms of the UPS tariff are that UPS provides a base value of $100 for every shipment. Okay? Then in the cases where you're shipping jewelry, you're limited to $500 in insurance that you can buy. In all other cases, the limitation is $50,000 per package. And that's the terms of the contract. That's the terms of the tariff. The UPS's tariff. Tariff is a contract. I thought you said the tariff is a ______. How about the waybill? The waybill repeats the terms and conditions that are in the tariff. The tariff is a published tariff, and the Ninth Circuit has held that that has the force and effect of law and is binding on UPS. Okay, if we assume that the waybill constitutes the contract, do you agree that that's a contract? Yes. It appears that in our prior decisions, particularly ReadWrite Corporation, we have held that the contract must offer the shipper the opportunity to purchase additional insurance. Correct. All right. Now, how then was the contract violated if the provisions of the waybill allowed for the purchase of additional insurance? Okay. The tariff provided that the shipper could purchase up to $50,000 in insurance. That's what it provided. So it provided the shipper with the opportunity to purchase up to $50,000 per package. So far, the shipper is compliant with the law. Yes. However, UPS's agents, UPS's agents, through apparent mistake, tell the shipper's agents, you can only insure this for $558. Now, that's where I have a difficulty, because I'm viewing this that the contract complied with the law. And how is it that the agent was able to amend the contract on the spot so as to violate the law? That's my difficulty with your argument. No, the agent couldn't, wasn't allowed to do that. The agent had to follow the terms and conditions of the tariff. The agent could not place a $558 limitation on the amount of insurance that could be bought, because there's no such limitation in the tariff. The difficulty is that you can buy up to $50,000. Yes. The cases say you have to be given the opportunity to buy excess insurance. And knowing that he wanted to buy more but not checking with Mr. Kessel, this gentleman in Odessa basically buys extra insurance, but only buys it for $558. Okay. Are we supposed to basically look into his head and say, you know what, he wanted to buy more, therefore his signing the way bill and signing this and turning over the paintings somehow wipes away the contract? Well, you see what you're doing there is I think you're doing the opposite, Your Honor. You're ‑‑ if you're enforcing this $500 limitation, you're saying that the parties can make their own contract even though the tariff provides otherwise. See, the issue ‑‑ Well, but the tariff ‑‑ The tariff ‑‑ No, you're actually saying they can make their own contract in the sense that he went ahead and released his paintings knowing they were only insured for that amount, correct? Yes, he did. Okay. So then they got shipped. Yes. And if ‑‑ He didn't have to turn them over to UPS, did he? No, no. But you see, the specific issue before the court, and I think I stated this in the reply brief, is whether the reserved valuation doctrine, which is that doctrine that requires them to offer insurance for a greater value, whether that requires that they at least offer the greater value that their tariff provides. And that's the precise issue before the court. The argument that he could have gone ‑‑ In the King Jewelry case, it kind of semi‑straddles that point, because it basically said in that case, well, you have to give them an opportunity to buy more insurance, but you don't have to do it necessarily up to the full value of the item. I know it's a little bit different here, but it seems to me that that's an instructive case. You see, the King Jewelry case, in the King Jewelry case, the Ninth Circuit clearly and unequivocally held that the parties could not make their own contract, that they were bound by the tariff. I thought that that case supported the appellant more than it supported the appellee. So, you know, I guess, then, if you're bound by the contract, the contract says you may purchase up to ‑‑ $50,000 per package. And so that opportunity was provided. I don't see how your cause of action survives if the opportunity in the contract was given to purchase that higher amount. But the opportunity wasn't provided. The tariff said he could purchase up to $50,000 in insurance. The agent said you can't purchase up to $50,000 of insurance, because there is some UPS regulation that limits the amount of insurance you can purchase to $558. See, it seems to me like what your case is, is really fraud in the inducement. I mean, in a way, that's ‑‑ A mistake in the inducement. I wouldn't call it fraud. Anyway, but it really ‑‑ Remember, this is a scene in Odessa where, I mean, it's an interesting ‑‑ No, I understand the situation. Nobody can read the contract at all. The right language in the contract is in English, but in a way, it's like we have the right facts and the wrong claim in front of us. Because the claim we're asked here is really whether or not to enforce the contract. There's really not, as I read the pleadings, you haven't really made the mistake and fraud common law claims. If you go to the King Jewelry case, the parties in the King Jewelry case contracted to insure the candelabra shipment for whatever it was, $35,000. The tariff said that FedEx would only be liable for $500 for a shipment of that type. And so the court, the Ninth Circuit held that the tariff control, not the individual agreement that was made by the shipper and FedEx's agent for insuring it for $35,000 and that the remedy was to return the excess premium. This is that case just in reverse. The arbitrary limitation is not to purchase too much insurance, but to purchase too little insurance. The shipper comes, shipper's agent comes with instructions that he wants to insure the shipment for $60,000, which could have been done if the paintings were simply packaged in two packages because it's a per package limitation for $50,000. Now, under the terms of the UPS tariff, the UPS agent could have done one of two things. He could have said, these are items of unusual value. We won't accept it for shipment at all, which the tariff does provide for that. Or he could have said, we accept this for shipment. If you want to insure it for $60,000, you put it in two packages, an insurance package for $30,000, which is within our $50,000 limit. But what he couldn't do is say, well, you can only insure this for $558, because the tariff didn't provide for that. Counsel, when you speak of tariff in King Jury, are you referring to the air bill? Because it didn't use the phrase tariff in King Jury. So when you use the phrase tariff, are you talking about the air bill or the way bill? Yes, the way bill has terms and conditions on the back, which duplicate terms and conditions in a published tariff by the carrier. Now, as the Ninth Circuit held in TWA versus American Coupon Exchange, before airline deregulation, these tariffs had to be filed with the CAB, and it were regulated by the CAB. After deregulation, the CAB dropped out of existence, but the tariff continued to have the force and effect of a federal regulation, and the enforcement duty was shifted to the courts. This case, it's sort of like the electric company, which is also a regulated industry, had sent somebody a bill, and because of a mistake on the bill, they charged five times too much. So the consumer pays the bill, then later on finds out they've charged too much, wants a refund, and the electric company says, no, no, you can't have a refund because we've made a contract here. You agreed to pay five times more than our going rate. Now, I don't think that the courts would rule in favor of the electric company because it's a regulated industry, the electric rates are supposed to be standard and regulated, and they're supposed to follow them in cases. This is the same force and effect that the UPS tariff has. The UPS tariff has certain terms and conditions that have to be met, and if they're not met, under the contract, the UPS has to allow them to purchase 50,000 insurance per package if they accept it for shipment with some exceptions that don't apply, and that wasn't done. Now, the district court said, why didn't he take it someplace else and ship it with some other person? But it seems to me that's the caveat in TOR theory that would just get rid of the reserved valuation doctrine. Do you want to reserve your time, then? Yeah, unless you have more questions. No, we don't. Thank you. Good morning, Your Honors. I'm Paul Friedman, Morrison Forrester, representing the Appalese UPS. This case presents the question whether the district court properly enforced the shipping contract between the parties according to its express terms, where the shipper, Mr. Bellick, declared a value on the way bill, signed the way bill, and the declared value was $558. Although Mr. Bellick, the plaintiff's agent, voluntarily proceeded, knowing full well that the insured value was $558, we're here today because Mr. Kessel has persisted through litigation in seeking to recover $60,000 or more than 100 times the insured value of the shipment. Well, leaving aside whatever value the paintings might be worth, he reasonably thought he could sell them for more than $558 when he brought them back to the United States, so he would have declared a higher valuation. Why isn't this like the airline case where the lady was told, you can't bring this package on board, it's the remains, so she instead has to put it into the cargo section, and basically the court says, you know, she really didn't get the benefit of the tariff because the airline wouldn't let her sign up to what the tariff allowed. Why isn't this the same thing? Are you referring to the clicker case? That's the Coughlin versus TWA. Oh. The difference here is that Mr. Kessel, through his agent, Mr. Bellick, received exactly what he contracted for. He had the opportunity to declare and pay for a value. This was not an exculpatory tariff like in the clicker case that Judge Hufstedtler wrote, where the airline said, well, you can put your dog in our hold, but we won't let you have any additional coverage, but rather this is a case where there was a very clear and specific opportunity for Mr. Bellick to declare and pay for the higher amount of coverage, and that's the 558. Here's the difficulty is that it's an easy case if you say here's the piece of paper, he signed it, have a nice day. It's a harder case if you say, look, what does it mean that you can insure up to $50,000? Doesn't that render that, in effect, basically meaningless? If you can insure up to $50,000, but every time you go in they say, well, I'm not going to let you insure for more than the customer's value, which isn't necessarily market value. Okay. Let me address that first. When you look at the cases in this area, the release value cases, they pretty much fall into two buckets. The first bucket is the typical one, and that's where the shipper declared no value, bought no extra coverage or insurance either through the carrier or from an insurer. In those cases, the Ninth Circuit and other circuits look at the notice and the opportunity to obtain higher coverage. Typically, the limitation is enforced even when there is no subjective knowledge of the limitation, and honestly, in many of those cases, the outcome seems harsh. Then there's another smaller bucket of cases where the shipper actually obtained additional insurance. It may not have been full coverage, but they obtained insurance either from an outside insurer or through the carrier. This case is in that second bucket. But don't we have a little spin on that case where we have the agent who specifically informed the shipper's agent that no additional insurance could be purchased? What do we do with that little quirk in the facts? Well, that's not quite it, Judge Rawlinson. The state of the record is that Mr. Bellick, the shipper, or the shipper's agent, however you want to look at it, desired greater insurance. That's what he testified to. Greater than the amount that was purchased. Greater than $100, which would be the amount if you didn't buy any coverage or insurance as a release value. He wanted more than $100. It's somewhat equivocal when you look at his deposition. About half the times it comes up in the deposition, he said he wanted $60,000, and other times he said the conversation didn't get that far. But let's accept that he wanted more than $100. And let's also accept that the clerk in Odessa said you want- Can we expect to find more than $588? $558, yes. Let's accept that because I think that's the question that's really posited by given the admissions in the case. Let's play this out. Mr. Bellick comes into the shipping counter. He presents an invoice, which is required under the way bill, and which is going to be used by UPS and the customs officials of both countries, the Ukraine and the United States. And he swears in that invoice that the value of this shipment is $558. That's what the invoice says. I declare that this shipment is worth $558, and the contents are itemized. He also presents the Ukrainian customs document, which is in the record, showing a value of $558. He then asks the clerk for $60,000 in coverage, according to some of his testimony. He asks for more than 100 times the value that's been declared for customs purposes of insurance. The clerk sees a red flag. This is not typical. This is highly unusual. And, again, all we have is Bellick's testimony on this. But he says that the clerk called a superior, his or her supervisor, and said, basically, this guy wants $60,000 and all the documentations that we're going to present to the customs of both countries says $558. Well, that's a huge red flag. It's true. It's nowhere in the tariff that UPS may exercise good sense, common sense, and prudent business judgment. But that's exactly what the UPS clerk did in this instance. That makes sense. But let's say he does insure it for two packages of $30,000. Doesn't he then have, upon collection, the obligation to show that that's a fair value in order to collect the insurance? I don't think it's any different, Your Honor, than if I have a house that's worth $100,000 and I seek to insure it for more than 100 times that for $10 million. I don't think the insurer is going to write the policy. I don't think I'm going to get it because no one wants to be at the back end of that controversy. The difficulty here is if it's worth something in excess of $558,000, but basically UPS is inserting into its tariff a little proviso, and that is provided. It says in here UPS can obtain additional coverage up to $50,000 per package. To insure a package having a value greater than 100, show the full value in the declared value field as appropriate to UPS shipping system. So you've added now another proviso, and that is unless we believe that your declared value is higher than a reasonable value. But the way bill also says that no transportation shall be provided for any package which may breach any applicable export, import, or other law. And the statement in the invoice and in the Ukrainian customs document is that these packages are worth $558. And Mr. Belich signed the way bill, he signed the invoice that was required by the customs laws, and he swore that these were worth $558. How could the clerk exercising common sense and prudent business judgment have accepted a valuation of $60,000? We would be here on a different case had that happened, and unfortunately. So is your better argument that he couldn't have a valuation different than the customs valuation because that then would be UPS potentially involved in a customs violation? Well, it's certainly one of the two reasonable things that would come to the mind of somebody facing this kind of a transaction. One is there's something funny here on the customs side, and after all, UPS is in the way bill appointed as the agent of the shipper for customs purposes. UPS has serious obligations in the customs process. Or there's something funny on the insurance side. But one way or another, it didn't add up because $558 doesn't come close to $60,000. Okay, so what if he comes in and the customs declaration is $558, and he says, I would like to insure this for $1,000? Well, I would think that under that close of a case, probably it wouldn't have raised a red flag. But how do we determine whether or not UPS is abiding by its tariff, which is part of the contractual language? Is it close enough, not too close, too far away? I mean, we've got this sort of rubber band effect on the tariff, the $50,000. Well, I think what we have to do is to enforce the contract as it was entered into by the parties on that September day in Odessa. And the contract was that UPS would carry a shipment halfway around the world for $179, which was valued at $558. That's what Mr. Bellick signed for. When he was asked in his deposition, did you understand, and this is in the excerpt of record at page 93, when you shipped the paintings with the $558 value, did you understand that the $558 was the amount they were insured for? Answer, of course I did. He understood exactly what he was getting. He understood what he contracted for, and that's the benefit of the bargain. Now, UPS is not like the electric company. UPS is not like a phone company. It's totally deregulated. And you have to flip to another question, and that is, would UPS have gone forward with the transaction had Mr. Bellick insisted on some coverage other than the $558, which he swore to for customs purposes? It's short of some antitrust or other violation. They don't have any obligation to take a package from anybody, is that right? That's absolutely correct. UPS has no obligation to do so. But Mr. Bellick had a range of choices here, as came up in the argument and as Mr. McCarthy conceded. He could have used another carrier. That's admitted in request for admissions in the SER at 13 through 14. He testified in the SER at 25 through 26 that he, in fact, had used DHL for an international art shipment previously. It's a fact, and it's admitted that he could have gone to another carrier. He could have called Mr. Kessel because his testimony was that this was directly contrary to Mr. Kessel's instruction to obtain the insurance. He could have called Mr. Kessel and asked what to do. He could have walked away. That was another one of his choices. He could have found another source of insurance because the cases tell us, Reid Wright tells us, the Kemper Insurance versus Federal Express in the First Circuit tells us that this kind of insurance is available from parties, I mean from insurers. You can go outside of the transaction and obtain insurance coverage, and that's done. Let's say that UPS says, well, you can only buy $101 of insurance, and they keep saying that to everybody who walks in, you can only buy $101. What is the effect of them having this, in effect, public tariff that says you can buy up to $50,000 if everybody who walks in, they say you can only get $101? Well, the legal question posed is whether or not there's a fair opportunity to obtain coverage higher than the minimum release value, in this case of $100. When you look at the cases that have come up, there isn't a single case that Judge Ilston found, there isn't a single case that the appellant has pointed to, and there isn't a single case that we've found where Shipper actually bought more than that release value, actually bought more insurance, whether through a third-party insurer or from a carrier, and that the limitation of liability was not upheld. And the reason is, and that's critical, there's no case, there's no case that goes there, and it's critical because basically ReadWrite and King Jewelry tell us, and most recently King Jewelry a few months ago, that a fair opportunity does not mean the opportunity to buy the full value that you would like to buy. That was the holding of King Jewelry. And as I said, some of these cases, when you read them, when you read about the $750,000 of greyhound dogs in the Darrow case, when you read about the prized spaniel in the Clicker case, when you read about all the things that get destroyed and lost in these cases, you know, it often seems harsh. And why is that? Because they all involve those rare instances where something goes wrong. But when you look at King Jewelry and compare it to this. That's why you buy insurance is for that off chance that something is going to go wrong. Well, and that, of course, shows, I mean, we're not hearing it today, but the fact that insurance was sought and purchased shows that Mr. Kessel, as the principal, was quite aware of the opportunity to do so. He was an experienced businessman. He shipped with UPS for many years. And there was clear notice here. And at the point where the transaction was entered into, there was a meeting of the minds. As I read the transcript, what bothered me at first is I wondered whether the language and the English contract would be an issue. But as I read the deposition, it did appear that he said he understood that he was limited to 558. Is that right? It's at page 67, lines 11 through 14, where he's asked that question, did you understand that you were limited to 558? And he answered, of course I did. And, moreover, with respect to the way bill, the actual contract, Judge Rawlinson, he testified at page 28 of his deposition, excerpt of record 84, lines 12 through 18, that after he had the conversation about the insurance was when he signed the way bill. He didn't sign it before. He signed it after the conversation. And he stated that at that point in time, the issue had not been resolved satisfactorily to him. But he signed the way bill. He signed the way bill knowing that he's not fluent in English. I want to focus for a moment on read-write because I think it's critical to the outcome here. Read-write establishes that the shipper's purchase of a higher coverage accomplishes the function given by reasonable notice, whether or not notice is actually given. In that case, the Ninth Circuit held, in the opinion written by Judge William Fletcher, that the separate purchase of insurance simply cannot be reconciled with a contention that the shipper has been disadvantaged by a lost opportunity to pay more money in return for greater coverage. Because read-write did, in fact, separately purchase insurance covering damage, it's clear that the limitation of liability provision in the way bill is valid and enforceable against read-write. And read-write also tells us that once you get past the notice hurdle, which clearly we're past in this case, the burden shifts to the shipper. The shipper has the burden in this case to prove it didn't have a fair opportunity to make the purchase. And then we jump to King Jewelry, 2003, where it's through a carrier, where they declared and actually paid for $37,000 in coverage, but the limitation of $500 is enforced. I'd like to end by talking about the affidavit from Mr. Beilich said that he was told by the UPS agent that there were UPS rules and regulations that precluded him from insuring the paintings for $60,000. Are those in the record at all? First of all, subject to this Court's ruling under an abuse of discretion standard, Mr. Beilich's declaration is not in the record because it was struck by Judge Ilston. But wasn't the same thing in the record elsewhere? There is nothing in the record one way or another about any such regulations. That was the only reference to the UPS rules and regulations? Yes. I mean, he did testify about the conversation that he had. And clearly the clerk said he did testify about the conversation with the clerk that he was restricted to the 558. But he didn't refer to the rules and regulations in the deposition? I'm not certain. Okay. If we assume he referred to the rules and regulations in the deposition, were those rules and regulations anywhere in the record? No. No, they're not. It's critical to focus on why there's a release valuation doctrine. The carrier's liability exposure is preset up front. There's certainty known to both parties and is proportionate to the payment for the service. It's not a wild card to be determined after the fact if something goes wrong with the shipment. It's all about certainty. It makes it feasible for carriers in a global economy where there's millions of packages moving every day and billions every year to offer low rates to shippers, allows carriers to avoid potentially enormous exposure for packages shipped at low rates. This case presents more compelling circumstances than King Jewelry because there the shipper left the transaction with Federal Express thinking they had $37,000 in coverage. Here, Bellick got exactly what he paid for. And UPS had no obligation to handle this package and it wouldn't have agreed to provide the service under the contract that Kessel is attempting to rewrite through the judicial process. Thank you. Thank you. Mr. McCarthy, did you have anything to add? No. Yes. Mr. Friedman has given you a kind of inaccurate version of this invoice, which is really a customs document. The testimony in the record was that the Ukrainian export customs set the $558 figure based on the value of the raw materials, which was the canvas pigments and stretcher bars, which was a minimal value which they set because they were told that the paintings were going to go on exhibit and were probably coming back to the Ukraine. It had nothing to do with the fair market value. Now, if they'd sold the paintings in the United States, I don't know whether they would have had to pay a Ukrainian export some more money. They may have. But as far as they had no contracts, they had no assurance that the paintings would sell. As far as Ukrainian customs were concerned, the paintings were going to go out and come back. So they put a minimal value on there. That was in the record. But then knowing that. That was never represented by Bellick as the fair market value of the paintings. Yes. Knowing that. He says, yes, I understood that that was the insured value. So he hands over the paintings, signs the papers. He could have called his boss or his principal. He could have gotten other insurance. But how can we basically rewrite the contract he made? No, you're not rewriting the contract. You're enforcing the tariff. Could he have found another carrier? Yes. Could he have bought outside insurance? Yes. Could he have gone on the plane and just rolled up the paintings and stuffed them under his coat? Yes. But does the reserve valuation doctrine require those things? No, it doesn't. Reserve valuation doctrine requires that the carrier offer more insurance. And they did. Yes. The narrow issue before the court is whether the reserve valuation doctrine requires them to offer at least as much extra insurance as the tariff provides. That's the issue before the court. You know, if UPS says you can insure up to $50,000 per package, then it would seem to me that the reserve valuation doctrine would at least enforce that provision of the tariff. If I ship this piece of paper, then they're obligated, if I want to pay the insurance, to insure it for $59,999. Yes, but remember when you do that. Are they obligated? If you buy the insurance. If I buy the insurance, then they have to ship it. UPS's tariff says that the shipper can declare a higher value up to $50,000 per package, in which case the shipper pays a higher rate based on the premium for insuring that amount, and UPS, in essence, passes that on to a third-party insurer. So it doesn't really – this is a loss case. It doesn't really matter what you're shipping. There's a certain risk of loss for a particular package. But doesn't King-Jory kind of repute your argument that up to the maximum has to be allowed, the maximum insurance has to be offered? No, my argument was not the maximum. I didn't argue that you had to offer the amount up to the actual value of the item. I merely said that they have to offer up to what their tariff provides is the maximum per package. So up to $50,000. Your argument is they have to offer up to $50,000? If the shipper is willing to pay for it. However, if they lose or damage the package at that point, the UPS contract says that they're only liable to pay the actual value of the item shipped. Now, I mean, this is not unusual. This is standard insurance language. You can't make a profit by having UPS lose your item. You've got to prove that it's actually worth $60,000. $60,000 would be a maximum value of the paintings. Actual proof at a trial might come out considerably less. But if you were buying insurance, you would want to buy it for the maximum value. UPS wouldn't be required to pay anything but the actual value. But what UPS has argued would require the agents to appraise every parcel as it came in. They would appraise it accurately. That would be a tremendous burden on any carrier like UPS. I think their argument is that they're not appraising it, but when a transaction which in their view is so highly disproportionate, they're not required to accept that at a higher valuation. Highly disproportionate to what, though? It's only disproportionate to this minimal value that Ukrainian export put on it, the minimal value being put on it under the assumption that these paintings were going to go up, be exhibited, and come back. You know, you're not buying the paintings from the Ukrainian government. You're merely paying them a tax to take it out of the country. What's your response to opposing counsel's position that UPS did not want to become embroiled in what could have been a customs dispute? Embroiled? I didn't. If the declared value for purposes of shipment was so disproportionate to the declared value for purposes of customs. The declared value, the only, the $558 is the declared value for purposes of export for the Ukrainian authorities. Now, in this situation where paintings are being shipped to be exhibited at City Hall in San Francisco and are probably going to come back, the value that a custom, even this country's customs would place on that would not necessarily be the full market value because this is, if paintings were just sent on exhibit and come back, that's, they're not really being imported to this country, are they? It seems to me, you know, you might have some kind of consumer protection claim if you think it's a bait and switch the way they're using the tariff. But when Mr. Belich signs up to the contract and says, I knew I was signing it, I knew that's what it was insured for, and he lets the paintings go. Well, he also testified that. Don't we just look at the contract at that point along with his testimony? He also testified that he thought that he was simply buying extra protection when he bought the insurance. Well, it was. Well. He got $458 more. Well, in the case of, let's take automobile insurance. I could go out and buy collision insurance in addition to liability insurance. I could choose not to buy collision insurance. If I don't buy collision insurance and I get hit and it's the other person's fault, they still have to pay for my damages because of the concept of fault. In this case, under the contract, if you don't buy the insurance, UPS isn't liable at all except for the first $100. That's not a usual notion of how insurance works. Okay. I appreciate your point on that. Your time has expired. We'll give you some extra time, and the case of Kessel v. UPS will be submitted. Thank you. We're adjourned for the morning. All rise.
judges: Ferguson, McKeown, Rawlinson